**Salvatore J. CORSO, Appellee,**

v.

**CREIGHTON UNIVERSITY, a Corporation, Appellant.**

**Nos. 83–2247, 83–2330.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1984.

Decided April 2, 1984.

Frank Matthews, Matthews & Cannon, P.C., Omaha, Neb., for appellee.

Lyle E. Strom, Glenda J. Pierce, Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., for appellant.

Before LAY, Chief Judge, HEANEY and BOWMAN, Circuit Judges.

LAY, Chief Judge.

Creighton University, a Nebraska corporation, appeals from the order of the district court enjoining it from expelling Salvatore Corso, a citizen of the State of New York, from the Creighton University School of Medicine. Corso was expelled from the medical school in August, 1982. Corso then brought suit in the federal district court asserting jurisdiction founded on diversity of citizenship. His complaint alleges that the procedure employed by the University to expel him was a breach of contract. The district court, the Honorable C. Arlen Beam presiding, found that Corso had been expelled from the medical school for a nonacademic offense and that the University had not followed its procedures prescribed for the adjudication of nonacademic offenses. Accordingly, the court held that Creighton had breached its contract. The court enjoined the expulsion and ordered the school to afford Corso appropriate procedures prior to taking any final disciplinary action.

On appeal, Creighton contends that the district court erred in classifying the offense as nonacademic. We find that the district court did err in its classification of the offense; however, for the reasons discussed below, we affirm the finding of a breach of contract.

Corso began his first year of medical school in the fall of 1981 at Creighton University. In May, 1982, Corso and several other students were accused of cheating on their first year finals. Corso was first informed of the accusation by a letter he received from Dr. Matthew Severin, Associate Dean for Student Affairs of the School of Medicine. Dr. Severin informed Corso that upon the recommendation of the School of Medicine Committee on Freshman Advancement (Advancement Committee), the Acting Dean of the Medical School, the Reverend James E. Hoff (Father Hoff) had appointed a special committee to investigate the alleged examination irregularities. Based on their evaluations of the examinations and conferences with the accusing professors, the investigatory committee concluded that Corso and another freshman student had collaborated on the relevant exams. Their conclusions were reported to Dr. Severin and the Advancement Committee on June 22, 1982. The Advancement Committee reconsidered the issue and unanimously passed a motion to recommend to the Executive Committee and the Dean that Corso be expelled.

Corso was informed of these proceedings by telephone and a follow-up letter. He was advised that he could respond to the charges in person or by letter. He was to direct his response to Dr. Severin, who would serve as the liaison between Corso and the various committees and the Dean. Corso responded by letter. He denied any involvement in the alleged cheating, requested reconsideration of his case and requested permission for an opportunity to appear before any committee that would make findings concerning his status with the University. On July 6, Corso met with Dr. Severin in Omaha. At this meeting Corso received copies of all the evidence and was told to give any response he may have to Dr. Severin in writing and that it would be transmitted to the Executive Committee. Corso's request to personally appear before the Executive Committee was rejected, and he was informed that it would be of no avail to see the Dean at this point. Corso did respond by letter, again denying any involvement.

Father Hoff then conducted his own investigation, including interviews with 20–25 medical students. Corso was asked to report to the Dean on July 26 and was one of the students interviewed. Corso was asked the same questions as the others; however, at that time he was not told of the other interviews or what they had revealed about Corso. At this interview, Corso again denied any involvement, stating to Father Hoff that "I stand before God and

swear, in a state of grace, I have not cheated, colluded or cooperated on .... exams ...." Several others who previously had been interviewed by Father Hoff, however, had admitted that they had collaborated on the relevant examinations and most of them had implicated Corso. Despite relatively equal culpability in the alleged cheating, three of the students involved were suspended; one was given the option of resigning or being expelled; one was placed on probation for "suspicion of cheating"; and one, Corso, was expelled.

The issue on appeal is not whether Corso cheated or whether he lied about his activities; rather, we are concerned with whether the procedures that resulted in Corso's expulsion complied with those provided for in the contract between the parties.

■ The relationship between a university and a student is contractual in nature. *See, e.g., Williams v. Howard University*, 528 F.2d 658, 660–61, (D.C.Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d

123 (1976). In order to establish his claim, Corso must prove that the University breached a contractual right.[1] For our purposes, the Creighton University Handbook for Students 1981–82 [Student Handbook] is the primary source of the terms governing the parties' contractual relationship.[2] In one part of the section relating to student disciplinary proceedings, the Student Handbook, *inter alia*, creates two distinct procedural formats for student discipline: one for "academic and academic-related" offenses and the other for "nonacademic" offenses. It then delegates full authority for academic disciplinary matters to the Deans of the particular schools. Nonacademic offenses, however, are handled by officials that are representative of the University as a whole and by the University Committee on Student Discipline (University Committee). The Handbook also elaborates the procedures to be followed by the University Committee in the adjudication of disciplinary matters.[3]

1. We find no merit in Corso's allegation that the expulsion constituted state action; therefore, Corso is limited to his breach of contract claim.

2. On appeal, Creighton also contends that the district court erred in treating the Student Handbook as the sole source governing the contractual relationship between it and Corso. Creighton argues that other sources, i.e., registration forms, the School of Medicine Bulletin, the School of Medicine Policy Booklet, Student Edition, are equally applicable. Without determining the applicability of these other documents, we merely note that the provisions on which we rely, contained in the Student Handbook, are overriding. Moreover, for the most part, these alternative documents incorporate the Student Handbook by reference, *see, e.g., The Creighton University Bulletin for the School of Medicine*, and do not contradict the Handbook.

3. The Handbook contains the following relevant portions:

> 3. UNIVERSITY DISCIPLINE—PURPOSE AND PROCEDURES
>   a. PURPOSES OF UNIVERSITY DISCIPLINE
>
> .  .  .  .  .
>
> In all cases where misconduct may result in serious penalties, all procedural safeguards are observed and the student has the privilege of a hearing before the University Committee on Student Discipline.

> All University students are members of both a particular school and the social body of all University students. With this in mind, the authority for adjudication of student disciplinary matters is delegated in two ways. First, the Dean of the particular school and his staff have full authority regarding all academic and academic-related disciplinary matters. Second, the Vice President for Student Personnel, and through him, the Associate Vice President, Associate Dean of Students and the University Committee on Student Discipline have full authority in all non-academic student discipline.

*Student Handbook*, 1981–82, at 15–16. Under the University disciplinary proceedings, the student is entitled to a preliminary hearing for serious violations, the assistance of an advisor, and a hearing before the University Committee on Student Discipline. The Student Handbook also elaborates the details of such a hearing: *inter alia*, the student is to be provided advance written notice of the charges, revelation of his accusers, and access to any supporting documents; an opportunity to present his or her own case orally before the Committee; and the right to appeal the decision. Membership of the Committee is comprised of the Dean of Students, two appointed faculty members, and three students. Finally, a minimum of four votes is necessary for the imposition of a serious penalty. *Id.*

The Medical School regarded the matter as an academic disciplinary matter. Accordingly, it handled the matter internally, according to their own procedures, with full authority ultimately placed on Father Hoff, the Acting Dean. The district court, however, determined that Corso had been expelled for his denial of the cheating, i.e., lying, rather than for the cheating itself. This finding was premised primarily on the disparate disciplinary treatment meted out to the students, despite relatively equal culpability in the alleged cheating incident. The court reasoned further that, because lying could accompany any infraction, academic or nonacademic, it was a *nonacademic* offense. The district court found that Corso was denied some of the procedural safeguards attendant to nonacademic adjudications and that such denial constituted a breach of contract.

■ We must respectfully disagree with the district court's division of the incident into two distinct disciplinary matters. Cheating on exams is clearly an academic matter, and, in this case, the lying was directly related to the alleged cheating. The alleged cheating and lying together constitute the operative facts of the incident. To adjudicate the lying without regard to the cheating belies the factual context in which the alleged lying occurred. Consequently, we find that it was reasonable for Creighton officials to view the entire incident as an interrelated matter. Because the operative facts were premised on an academic matter, it was reasonable to classify the matter as an academic offense. *See Student Handbook, supra* n. 3; *Board of Curators v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (medical student's dismissal for clinical incompetence based partly on school's consideration of personal hygiene and timeliness was appropriate).

Our disagreement with the district court's classification, however, does not end the inquiry. We recognize that the Student Handbook sets forth two procedural formats for offenses—the distinction being the classification of the offense as academic or nonacademic. However, in the paragraph which immediately precedes this classification, the Handbook also provides that: "In *all* cases where misconduct may result in *serious* penalties, all procedural safeguards are observed and the student has the privilege of a hearing before the University Committee on Student Discipline." Student Handbook, 15 (1981–82), *supra* n. 3 (emphasis supplied). Creighton argues that the provision for a hearing before the Committee does not control disciplinary sanctions related to academic matters. It argues that the controlling paragraph is the provision delegating full authority to the Dean on academic-related incidents. For support, Creighton asserts that the jurisdiction of the University Committee on Student Discipline is limited to nonacademic matters; therefore, it urges that the provision allowing a hearing before the University Committee should not apply to an academic or academic-related matter. Second, Creighton asserts that if the hearing provisions were to apply to academic matters, the "full authority" to adjudicate the academic matters delegated to the Deans of the particular schools in the next paragraph becomes meaningless. Finally, Creighton argues that the University President's approval of Father Hoff's decision and conclusion that the proper procedures were followed reveals that the University does not interpret the hearing procedures applicable and that the court should defer to the University's interpretation of its own regulations. Thus, under Creighton's interpretation, the application of the provision for a hearing prior to imposition of a serious penalty would be limited to *nonacademic* cases that may result in a serious penalty.

We must respectfully disagree.

■ In this diversity case our interpretation of the contract is governed by Nebraska law. It is fundamental to contract interpretation that we must construe the contract as a whole and attempt to give meaning to all parts, consistently with one another. *See, e.g., Bass v. Dalton*, 213 Neb. 360, 329 N.W.2d 115 (1983); *Docken-*

*dorf v. Orner,* 206 Neb. 456, 293 N.W.2d 395 (1980). Moreover, where, as here, the contract is on a printed form prepared by one party, and adhered to by another who has little or no bargaining power, ambiguities must be construed against the drafting party. *See DaLee Realty, Inc. v. Kuhl,* 209 Neb. 6, 305 N.W.2d 891 (1981); *Lyman-Richey Sand & Gravel Co. v. State,* 123 Neb. 674, 243 N.W. 891 (1932); *Restatement (Second) of Contracts* § 206 (1979). It is also axiomatic that where general and specific terms in a contract may relate to the same thing, the more specific provision should control. *See State v. Commercial Cas. Ins. Co.,* 125 Neb. 43, 248 N.W. 807 (1933).

 Applying these principles to the instant contract, we find that the provision for a hearing before the University Committee in cases where a serious penalty may be invoked clearly governs the case before us. The provision specifies that a University Committee hearing may be requested in *all* cases involving a *serious* penalty. Significantly, there is no qualifying or limiting language involved. By its terms, this provision specifically governs *all* cases where *serious* penalties are involved, without regard to whether the underlying offense was academic or nonacademic. Although this interpretation is contrary to that asserted by the University, it is not inconsistent with the contract terms read as a whole. Moreover, we find nothing in the contract to support Creighton's contention that the University Committee is somehow jurisdictionally precluded from adjudicating academic cases. We think it is clear that the general delegation of authority to the Academic Dean to adjudicate academic offenses must be interpreted in light of the contract terms that precede the delegation and which specifically govern cases in which serious penalties may result. *See State v. Commercial Cas. Ins. Co., supra.* Accordingly, we find that the clear meaning of the contract is to place plenary authority in the Academic Deans to adjudicate academic disciplinary offenses except as to those cases that will result in the imposition of a serious penalty. In the cases where a serious penalty may follow, such as expulsion, the student is to be provided the procedural safeguard of a fair hearing before the University Committee and the right to appeal the Committee's findings to the President of the University. *Student Handbook* at 16.

In the instant case, Corso's misconduct, albeit academic or academic-related, resulted in expulsion, which the Student Handbook specifically regards as a serious penalty. *Student Handbook* at 16. It is clear that Corso was not accorded the privilege which the contract gives him, to wit, the right to a hearing before the University Committee on Student Discipline. Accordingly, we hold Corso must be afforded his contractual right to such a hearing prior to being expelled from the medical school.

The district court's order finding a breach of contract is affirmed. We also affirm the grant of injunctive relief in as much as it enjoins Corso's expulsion and orders the appropriate procedures to be followed.