In accordance with the Memorandum and Order filed this day and incorporated herein,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that judgment is entered in favor of defendants St Charles R–IV School District, Mark Keen, J. Larry Milan, Jerry E. Reese, Marta Baier, Jean Meyer, Gary Lacey, Dr. Wayne Oetting, and Diane Rallo, Missouri Department of Elementary and Secondary Education, Robert E. Bartman and John Heskett and against plaintiffs Richard Breen, a Minor, by and through his next friend, Linda Breen, and Frank and Linda Breen. Plaintiffs shall take nothing.

**Dr. Kristi ROSSOMANDO, Plaintiff,**

v.

**BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA and Peter Spalding, Director of the Postgraduate Orthodontic Program, in His Individual and Official Capacity, Defendants.**

No. 4:97CV3247.

United States District Court, D. Nebraska.

May 11, 1998.

Riko E. Bishop, Perry, Guthery, Haase & Gessford, P.C., Lincoln, NE, for Plaintiff.

David R. Buntain, Cline, Williams, Wright, Johnson &· Oldfather, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

The plaintiff has three claims. The claims are all founded upon her dismissal as a postgraduate student at the University of Nebraska College of Dentistry.

First, pursuant to 42 U.S.C. § 1983, the plaintiff complains that her right to substantive and procedural due process under the Fourteenth Amendment was violated when she was dismissed. Second, she claims that her dismissal violated her right to be free from discrimination as a disabled person under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Finally, under this court's supplemental jurisdiction, 28 U.S.C. § 1367, the plaintiff claims that the defendants breached an implied contract under Nebraska common law when they dismissed her.

The defendants have moved for summary judgment on the two federal claims. Finding that there are no material facts in dispute, and giving the plaintiff all the inferences that are due her at this stage of the proceeding, I will grant the motion for summary judgment. I will also decline to exercise supplemental jurisdiction over the state law claim.

### I.

Pursuant to NELR 56.1(a)[1], the material facts about which there is no genuine dispute are set forth below:

---

1. The plaintiff has failed to comply with NELR 56.1(b). *See* NELR 56.1(b) at 829 (West 1998). The rule states in pertinent part that: "The party opposing a motion for summary judgment shall set forth in its opposing brief a separate statement of each material fact as to which it is contended there exists a genuine issue to be tried and as to each shall identify the specific document or discovery response or deposition testimony (by page and line) which it is claimed establishes the issue." The plaintiff has given me

## A. The Parties

1. Dr. Kristi Rossomando is a United States citizen who currently resides in Connecticut. (Complaint, ¶ 1; Answer, ¶ 1.)

2. The Board of Regents of the University of Nebraska is a body corporate that exists and operates by virtue of the constitution and statutes of Nebraska. (Complaint, ¶ 2; Answer, ¶ 2.) The College of Dentistry is a part of the University of Nebraska Medical Center ("UNMC"). (Answer, ¶ 2.)

3. Dr. Peter Spalding is a faculty member in the Department of Growth and Development in the College of Dentistry who has been the Program Director for the Orthodontic Postgraduate Program since May 1, 1993. (Spalding Affidavit, ¶ 1.)

## B. Dr. Rossomando's Enrollment

4. In July 1995, Dr. Rossomando was one of three students who began the two-year Postgraduate Orthodontic Program in the College of Dentistry. Dr. Spalding served as director of the Postgraduate Orthodontic Program throughout the time that Dr. Rossomando was a student. (Spalding Affidavit, ¶ 3.)

## C. Dr. Rossomando's First Year

5. During the first year of the orthodontic program, Dr. Rossomando and her fellow students were required to take various classes and to participate in clinical training in the College of Dentistry. As a part of the clinical training, each student was required to provide orthodontic care to patients in the clinic at the College of Dentistry under the supervision of part-time and full-time orthodontic faculty members. Such clinical training is an essential part of the orthodontic program because it is necessary for students to learn and develop the technical and patient management skills necessary to become competent orthodontists. (Spalding Affidavit, ¶ 4.)

6. In the spring of 1996, Dr. Spalding conducted an evaluation of the three first-year students in the orthodontic program by requesting all full-time and part-time orthodontic faculty members to fill out evaluation forms. The information on the evaluation forms was tabulated. (Spalding Affidavit, ¶ 5.) The evaluation of Dr. Rossomando at the conclusion of her first year was substantially below that of the other two first-year students. (Spalding Affidavit, ¶ 6, Exhibit A.)

## D. Dr. Rossomando's First–Year Evaluation & Remediation Program

7. Based upon her low evaluations, Dr. Spalding's observations of Dr. Rossomando during her first year, and comments that Dr. Spalding received from various faculty and staff about her performance, he concluded that Dr. Rossomando's performance was not satisfactory and needed remediation for her to complete the two-year program. (Spalding Affidavit, ¶ 6.)

8. On July 10, 1996, Dr. Spalding and Leslie C. Erickson, the other full-time orthodontic faculty member, met with Dr. Rossomando to discuss her performance during the first year. They showed her the tabulation of her first-year evaluations. (Rossomando Dep. 138:7–141:9, Exhibit 12.) They also gave her a memorandum that summarized the deficiencies observed. These deficiencies were listed as follows:

1. Preparation (care and thoroughness) for clinic and case presentations.

2. Professional behavior in clinic and classroom.

3. Building positive relationships with parents of patients, colleagues, and faculty.

4. Control of emotional expression.

5. Response to constructive criticism.

6. Acceptance of responsibility when concerns are raised. Failure to initiate strategies to act on these concerns.

7. Technical ability in clinic.

8. Adherence to asepsis.

(Spalding Affidavit, ¶ 7, Exhibit B.) The memorandum advised Dr. Rossomando that

a brief that does not provide a "separate statement" of disputed facts keyed to the evidence. The brief also fails to explain why the facts discussed in it are either material or genuinely in dispute if material. Notwithstanding the plain-

tiff's failure to comply with the rule, I have carefully examined the submissions of the plaintiff in arriving at my decision that there are no material facts that are genuinely in dispute.

her continuation in the Postgraduate Orthodontic Program was "in jeopardy," outlined a proposed remediation program, and warned her that if her level of performance did not improve, dismissal from the program might be necessary. *(Id.)*

**E. Dr. Rossomando's Performance After July 1996**

9. On August 31, 1996, Dr. Erickson retired and two new full-time faculty, Dr. Jeffrey Nickel and Dr. Laura Iwasaki, joined the orthodontics program on May 1 and June 15, respectively. From July through November 1996, Dr. Spalding, Dr. Iwasaki, and Dr. Nickel met with Dr. Rossomando periodically to review her progress in completing the remediation program. On August 15, 1996, the four full-time orthodontic faculty members met to review the first typodont and wirebending exercises set forth in the remediation program described in the July 10 memorandum. All four faculty members concurred that the exercises were unacceptable. On August 26, 1996, three full-time faculty met with Dr. Rossomando to review her progress in the remediation program and reviewed the problems with the first typodont and wire-bending exercises. During September 1996, Dr. Rossomando was given three memoranda concerning problems with the progress of her remediation program and an evaluation of her first case presentation. (Spalding Affidavit, ¶ 8, Exhibit C; Rossomando Dep. 110:1–123:12.)

10. On October 1, 1996, Dr. Spalding requested the full-time and part-time orthodontic faculty to do an evaluation of Dr. Rossomando to determine whether she had made progress since the evaluation in the spring of 1996. The evaluations and comments were tabulated. (Spalding Affidavit, ¶ 9, Exhibit D.)

11. During October 1996, Dr. Rossomando made four more case presentations, as required by her remediation program and attempted to complete the wire-bending and typodont exercises which were required. On October 30, 1996, Dr. Spalding, Dr. Iwasaki, and Dr. Nickel met to review the results and reach a decision regarding the outcome of the remediation program. The full-time orthodontic faculty agreed unanimously that Dr. Rossomando had not successfully completed all of the remediation program requirements. (Spalding Affidavit, ¶ 10; Rossomando Dep. 123:13–124:17.)

12. On November 4, 1996, Dr. Spalding met with Dr. David Brown, Director of Graduate and Postgraduate Programs in the College of Dentistry, and the orthodontic faculty members from Lincoln to discuss Dr. Rossomando's progress in the clinic. From November 5 through 11, Dr. Spalding was out of town. During his absence, Dr. Rossomando was suspended from the clinic, due to incidents of poor patient management and major deficiencies in technical skills. (Spalding Affidavit, ¶ 11, Exhibit E.) On November 12, Dr. Spalding met with faculty members about Dr. Rossomando's suspension from the clinic. Dr. Spalding and four faculty members also met with Dr. Rossomando on November 12. Dr. Rossomando requested that a program be created to enable her to return to the clinic. (Rossomando Dep. 171:13–25.) On November 13, Dr. Spalding, Dr. Iwasaki, and Dr. Nickel gave Dr. Rossomando a memorandum outlining the requirements which she needed to complete in order to return to the clinic. (*Id.,* 147:15–157:25; Spalding Affidavit, ¶ 11, Exhibit F.) At Dr. Rossomando's request, Dr. Robert Glenn, a part-time faculty member, was included in the group which was to evaluate whether she successfully completed the requirements. (Rossomando Dep. 165:5–166:1.)

13. On November 11, 1996, Dr. Spalding asked the orthodontics faculty to evaluate the performance of the three second-year students, including Dr. Rossomando. These evaluations were also tabulated. (Spalding Affidavit, ¶ 12, Exhibit G.)

14. From November 13 until December 12, 1996, Dr. Rossomando attempted to complete the exercises which were required in order for her to remove her suspension from the clinic. The technical and remediation exercises were reviewed by Dr. Spalding, Dr. Iwasaki, Dr. Nickel, and Dr. Glenn. On December 12, 1996, these faculty gave Dr. Rossomando a memorandum advising her that the results of the exercises relating to her clinic suspension were unsatisfactory and that her suspension from the College of Den-

tistry clinic remained in effect. (*Id.*, ¶ 13, Exhibit H; Rossomando Dep. 165:5–171:25.)

## F. Dr. Rossomando's Dismissal

15. On December 4 and 5, 1996, Dr. Spalding talked with all orthodontics faculty members concerning Dr. Rossomando's progress and status in the Postgraduate Orthodontic Program. Based upon all of the information which he had collected concerning Dr. Rossomando's unsatisfactory performance and her failure to complete the remediation program which had been established on July 10, Dr. Spalding recommended to Dr. Stephen Leeper, Dean of the College of Dentistry, that Dr. Rossomando be dismissed. (Spalding Affidavit, ¶ 14.)

16. On December 13, 1996, Dr. Leeper wrote to Dr. Rossomando, notifying her of her dismissal from the Postgraduate Orthodontic Program and advising her of her various avenues of appeal. (Spalding Affidavit, ¶ 14, Exhibit I.)

## G. Dr. Rossomando's Appeals

17. Dr. Rossomando appealed her dismissal to the Grade Appeals Committee in the College of Dentistry. On December 20, 1996, she presented a seven-page Appeal of Dismissal setting forth the reasons that her dismissal was "unfair." (Rossomando Dep. 70:1–9, Exhibit 3.)

18. On February 6, 1997, the Grade Appeals Committee held a hearing on Dr. Rossomando's appeal. Dr. Rossomando attended the hearing with her attorney and presented her written statement of appeal and additional exhibits pertaining to the appeal. Dr. Rossomando also presented oral testimony and was given an opportunity to question Dr. Spalding, Dr. Nickel, and Dr. Iwasaki. (Rossomando Dep. 70:1–75:2.) The hearing lasted for about four hours and the Committee deliberated for an hour. It issued a written report, summarizing the proceedings and its conclusions. In a unanimous decision, the Committee concluded that Dr. Rossomando "did, in fact, fail to satisfactorily complete the remediation program as outlined in the July 10, 1996, memo from Dr. Peter Spalding;" "The remedial procedure and process was deemed fair and equitable;" and the faculty did not act "in an arbitrary or capricious way during the remedial process designed for Dr. Rossomando." (Rossomando Dep., Exhibit 4.)

19. Dr. Rossomando appealed the decision of the Grade Appeals Committee to Dr. Leeper, the Dean of the College of Dentistry. Dr. Rossomando and her attorney met with Dean Leeper on March 7, 1997. Dr. Spalding and John Wiltse, a University attorney, also were present. Dr. Rossomando presented her reasons for appealing her dismissal. (Rossomando Dep. 80:13–82:6.) On March 11, Dean Leeper wrote to Dr. Rossomando, advising her that he had reviewed the information presented, along with the exhibits and report from the Grade Appeals Committee hearing, and that he had decided to affirm the decision of the Grade Appeals Committee. (Spalding Affidavit, ¶ 15, Exhibit J.)

## H. Dr. Rossomando's Disability Claim

20. Dr. Rossomando has a congenital vision problem, which is called alternating strabismus. According to Dr. Rossomando, "[W]hat actually occurs is I look with one eye, then I look with the other. I do not look with two eyes at the same time. It therefore affects, has some effect on my depth perception." (Rossomando Dep. 82:17–20.)

21. Prior to July 10, 1996, Dr. Rossomando never told Dr. Spalding that she had any visual impairment or other disability which affected her performance as a student, and she never requested any form of accommodation for any visual impairment or disability. (Spalding Affidavit, ¶ 16.) As a part of the remediation program, Dr. Spalding requested that Dr. Rossomando complete "a vision evaluation by a mutually agreed-upon ophthalmologist at no expense to you." (Spalding Affidavit, ¶ 16, Exhibit B, at 2.) Dr. Spalding made this request because several faculty members had observed that Dr. Rossomando generally positioned her face in closer proximity to her patients while performing clinical treatment than is the normal practice among dentists. (*Id.*)

22. Vincent J. Sutton, M.D., performed a visual examination on Dr. Rossomando on July 31, 1996. (Brown Affidavit, ¶ 2.) Dr. Rossomando and Dr. Spalding talked about her ophthalmology evaluation on August 26,

1996. Dr. Rossomando told Dr. Spalding that the physician said that she had a depth-perception problem and that he suggested that she wear "loops," which are magnifying lenses, while she was treating patients in the clinic. Dr. Spalding summarized their discussion in a memorandum to her, dated September 18, 1996, as follows: "We are pleased that you completed your ophthalmology evaluation. You have stated that the ophthalmologist encouraged you to wear 'loops' and we expect to see you using them."(Spalding Affidavit, ¶ 16, Exhibit C.) After his discussion with Dr. Rossomando, Dr. Spalding observed that Dr. Rossomando occasionally wore "loops" on her glasses while working in the clinic. (Spalding Affidavit, ¶ 16.)

23. On November 27, 1996, Dr. David Brown, the Director of Graduate and Postgraduate Programs at the College of Dentistry, received a letter from Dr. Sutton concerning the visual examination he had performed on Dr. Rossomando. The full text of Dr. Sutton's letter said:

> I saw Kristi on July 31, 1996. At that time I found that she has best corrected vision of 20/20 in both eyes.

> My exam found that she has reduced depth perception. There was also a small strabismus deviation.

(Brown Affidavit, ¶ 2, Exhibit A.)

24. Dr. Rossomando did not tell anyone at the University that she had any visual problem or disability which affected her performance as a student, other than the depth-perception problem which she discussed with Dr. Spalding after having the visual examination. She did not tell Dr. Spalding or anyone else at the University that she needed any accommodation to participate in the orthodontics program, other than wearing "loops" in the clinic. (Rossomando Dep. 85:13–20, 97:16–25; Spalding Affidavit, ¶ 16.)

25. Between November 13 and December 12, 1996, Dr. Rossomando worked with Dr. Brian Lange, a psychologist in the College, as part of the remediation exercises to regain her clinic privileges. (Rossomando Dep. 98:20–100:18.) As a part of her appeal to the Grade Appeal Committee, Dr. Lange provided a memorandum to Rossomando's attorney dated February 5, 1997, in which he said she had "a visual/tactile deficiency that she has

been unable to overcome." (Rossomando Dep., Exhibit 6.) In her written appeal following her dismissal, Dr. Rossomando did not refer to any vision problems. (Rossomando Dep., Exhibit 3.) The Grade Appeals Committee report said, "Although Dr. Rossomando mentioned her congenital visual/tactile impairment [at the hearing], she specifically stated that it did not affect her ability to complete the remedial exercises. She cited her previous dental education as evidence of this fact." (Rossomando Dep., Exhibit 4.) Dr. Rossomando admitted that this is what she told the Grade Appeals Committee. (Rossomando Dep. 87:20–89:6.)

## II.

I will first examine each of the plaintiff's two federal claims, and I will then address her state law claim.

### A. Due Process Claim

The plaintiff has a substantive due process claim and a procedural due process claim. The substantive claim is predicated upon the assertion that the plaintiff's dismissal from school was irrational or motivated by bad faith and ill will. The procedural due process claim is based upon the assertion that the grade appeals committee did not tape record the hearing despite a rule that required recording and that the hearing panel was biased.

### 1. Substantive Due Process

█ As to the substantive claim, the student "must show that there is no rational basis for the university's decision, or that the decision to dismiss was motivated by bad faith or ill will unrelated to academic performance." *Hines v. Rinker*, 667 F.2d 699, 703 (8th Cir.1981) (affirming summary judgment against a former medical student, who claimed that the failure to change a grade of "F," thus resulting in dismissal, was arbitrary and capricious) (citations omitted). *Accord Disesa v. St. Louis Community College*, 79 F.3d 92, 95 (8th Cir.1996) (affirming summary judgment of a nursing student's substantive due process claim); *Schuler v. University of Minnesota*, 788 F.2d 510, 515 (8th Cir.1986) (affirming summary judgment of

substantive due process claim by doctoral student in psychology), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *Ikpeazu v. University of Nebraska,* 775 F.2d 250, 253 (8th Cir.1985) (affirming dismissal of a pharmacy student's substantive due process claim that he was improperly dropped from the pharmacy program). *See also Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

■ Giving the plaintiff the benefit of the doubt, there is no evidence upon which a reasonable jury could find that the defendants acted irrationally or that bad faith or ill will motivated them when they removed the plaintiff from the program. For example, a committee of the teaching faculty (one of whom was placed on the committee at the plaintiff's request) unanimously agreed that the plaintiff should be suspended because she was not satisfactorily completing her studies. (Spalding Affidavit, ¶ 13, Exhibit H; Rossomando Dep. 165:5–171:25.)

■ The affidavit of a Connecticut orthodontist who employed the plaintiff after her dismissal does not create a material factual dispute. (Affidavit of Kiss.) While this orthodontist believes the plaintiff has good skills, the affidavit is irrelevant to the issue of the plaintiff's performance or lack of it at the University of Nebraska College of Dentistry. The affiant lacks personal knowledge about what happened in Nebraska. Moreover, the affidavit at most suggests that one orthodontist, after the fact, thought the plaintiff must have been doing well in school and the faculty thought otherwise. Such a difference of opinion does not prove irrationality, ill will, or bad faith of the defendants.

## 2. Procedural Due Process

■ If the plaintiff had a protected interest of some kind, the Constitution requires that she be accorded minimal due process before she was removed from the program. The Eighth Circuit Court of Appeals has described the process due the plaintiff in the following way:

> Dismissal of a student for academic reasons comports with the requirements of procedural due process if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and if the decision to dismiss the student was careful and deliberate.

*Schuler,* 788 F.2d at 514. *Accord Disesa,* 79 F.3d at 95; *Ikpeazu,* 775 F.2d at 254. *See also Horowitz,* 435 U.S. at 86.

■ Again, and giving the plaintiff all the inferences that are due her, no reasonable jury could find on this evidence that the defendants violated the plaintiff's procedural due process rights. The plaintiff was given repeated warnings of the faculty's dissatisfaction and of the possibility of dismissal. (Spalding Affidavit, ¶ 7, Exhibit B; *id.* ¶ 8, Exhibit C; *id.* ¶ 13, Exhibit H.) Furthermore, the decision to dismiss the plaintiff was careful and deliberate. (*Id.* ¶¶ 7, 8, 13, 14 & Exhibits B, C & H.) In fact, the evidence shows that the plaintiff received procedural due process which greatly exceeded the requirements of the Constitution. For example, the plaintiff received not only a written warning plus considered and deliberate review by the faculty, but the plaintiff's dismissal was also reviewed by the Grade Appeals Committee and Dean.

The plaintiff complains that the grade appeals hearing was not recorded despite a rule that required recording. The failure to record was an oversight, and the plaintiff was given an opportunity for a new hearing which she declined. In any event, she was given more process than she was due and the failure to follow the internal rules is not itself actionable as a federal constitutional claim. *Schuler,* 788 F.2d at 515 (failure to follow procedural regulations was not actionable when hearing exceeded process required by the Constitution).[2]

---

**2.** *Corso v. Creighton University,* 731 F.2d 529 (8th Cir.1984), does not help the plaintiff. There the court held in a diversity case that the failure to follow a University rule may constitute a state law breach of contract. The claim discussed here is, of course, a constitutional claim regarding due process. Moreover, in *Corso* the student was denied a hearing. In this case, the plaintiff was given a hearing before the Grade Appeals Committee that lasted about four hours and at which the plaintiff was represented by her able lawyer. (Rossomando Dep., Exhibit 4.)

As to the claim that the Grade Appeals Committee was biased because most of the members were subordinates of Dr. Spalding, there is no evidence to support the claim of bias. On the contrary, the evidence supports the conclusion that the panel was shielded from improper pressure by Dr. Spalding. For example, Dr. Spalding was subject to cross-examination by the plaintiff's lawyer during the hearing and the Grade Appeals Committee voted by secret ballot. (Rossomando Dep., Exhibit 4.) Moreover, even assuming one could find fault with the composition of the group, the review by the Dean makes it clear that the plaintiff has no actionable due process complaint. *Id.*

**B. Disability Claim**

■ The plaintiff argues that the defendants knew of her "depth perception condition" and made no reasonable accommodation for that disability, such as giving her more time to complete her school work. Accordingly, she claims that the defendants violated her rights under the Rehabilitation Act and the ADA.

"[A]n academic institution can be expected to respond only to what it knows (or is chargeable with knowing)." *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 795 (1st Cir.1992) (granting summary judgment for the medical school on a medical student's Rehabilitation Act[3] claim that school failed to reasonably accommodate his vision problems when the student made no claim of vision problems until after the school dismissed him), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Thus, " 'to be liable under the Rehabilitation Act, [it] must know or be reasonably expected to know of [a student's handicap].' " *Id.* (quoting *Nathanson v. Medical College of Pa.,* 926 F.2d 1368, 1381 (3rd Cir.1991)). Therefore, a "relevant aspect of this inquiry is whether the student ever put the medical school on notice of his handicap by making 'a sufficiently direct and specific request for special accommodations.' " *Id.* (quoting *Nathanson* ). The same is true under the ADA. *See, e.g., Tips v. Regents of Texas Tech Uni-*

*versity,* 921 F.Supp. 1515, 1518 (N.D.Tex. 1996) (holding that the plaintiff failed to establish a prima facie case because the postgraduate student did not make her learning disability known to the school) (quoting legislative history and regulations for ADA).

The plaintiff did not tell Dr. Spalding or anyone else at the University that she needed any accommodation to participate in the orthodontics program, other than wearing "loops" in the clinic. (Rossomando Dep. 85:13–20, 97:16–25; Spalding Affidavit, ¶ 16.) The undisputed evidence shows that the defendants encouraged the plaintiff to wear "loops." (Spalding Affidavit, ¶ 16, Exhibit C.)

Whatever disability the plaintiff had beyond needing "loops," no one at the University had reason to know of it. For example, *after* the plaintiff was discharged from the program, a psychologist whom she consulted wrote her lawyer that "I am sure [her recently discovered visual/tactile deficiency] is not something that the orthodontic faculty would look for or even be aware of, let alone know what to do to help her." (Affidavit of Rossomando, Exhibit C.) Furthermore, despite the belated concerns of her psychologist about a "visual/tactile deficiency," the plaintiff told the Grade Appeals Committee that her " 'visual/tactile impairment ... did not affect her ability to complete the remedial exercises.' " (Rossomando Dep. 87:20–89:6, Exhibit 4.)

In summary, on this record, no reasonable jury could return a verdict for the plaintiff regarding her disability claim. In particular, we cannot fault the defendants for failing to accommodate the plaintiff's visual/tactile problems when she did not tell the defendants about those problems or request an accommodation for them.

**C. Breach of Contract Claim**

■ Because the federal claims will be dismissed, I have the authority to refuse to exercise supplemental jurisdiction over the state law breach of contract claim. 28 U.S.C.

---

**3.** The Rehabilitation Act and the ADA are properly construed to mean the same thing in this context. *See, e.g., Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926, 930 (8th Cir.1994) ("Congress intended Title II [of the ADA] to be consistent with section 504 of the Rehabilitation Act.")

§ 1367(c)(3). The plaintiff does not assert (filing 1 ¶ 5 (Complaint)) that there is an independent jurisdictional ground for the breach of contract claim.

Moreover, I have the authority to decline to exercise supplemental jurisdiction over the state law claim if that claim is either novel or complex under state law. 28 U.S.C. § 1367(c)(1). There is a serious Eleventh Amendment waiver of immunity issue regarding the Board of Regents that turns upon novel and complex questions of state law. The State Contract Claims Act gives exclusive jurisdiction to a particular state court regarding contract claims brought against state institutions. Neb.Rev.Stat. § 81–8,305(3) (Michie 1995). Does the Nebraska statute constitute a waiver of immunity and, if so, to what extent? Since that issue would not be present if the contract claim were brought in state court and the state law waiver of immunity issue is both novel and complex, I think it prudent to decline jurisdiction.

Based upon both grounds, I decline to exercise supplemental jurisdiction over the state law breach of contract claim. *See, e.g., Innovative Home Health Care, Inc. v. P.T.–O.T. Associates of the Black Hills,* No. 97–3275, 1998 WL 185118, at *3–5 (8th Cir. Apr. 21, 1998) (district court did not abuse its discretion when it declined to exercise supplemental jurisdiction over a state law counterclaim when all federal claims had been dismissed and the counterclaim was somewhat novel and complex under state law).

### III.

There are no material facts that are genuinely in dispute regarding the plaintiff's federal claims. Applying the settled law to the undisputed facts, summary judgment must be granted in favor of the defendants on the plaintiff's federal claims. Furthermore, the court should decline to exercise supplemental jurisdiction over the plaintiff's state law breach of contract claim.

Accordingly,

IT IS ORDERED that:

1. Judgment will be entered in favor of the defendants and against the plaintiff on the federal claims providing that the federal claims are dismissed with prejudice, the plaintiff shall take nothing on those claims, and costs are taxed to the plaintiff.

2. Judgment will be entered providing that the state law breach of contract claim is dismissed without prejudice.

3. The defendants' motion for summary judgment (filing 18) is granted.