Valentin **DINU** and Abraham
**Tsoukalidis**

v.

## The PRESIDENT AND FELLOWS OF HARVARD COLLEGE.

### No. Civ.A. 99–11222–RGS.

United States District Court,
D. Massachusetts.

July 13, 1999.

David L. Kelston, Adkins & Kelston, P.C., Boston, MA, for Valentin Dunu.

Harvey A. Silverglate, Silverglate & Good, Boston, MA, David L. Kelston, Adkins & Kelston, P.C., Boston, MA, for Abraham Tsoukalidis.

Robert W. Iuliano, Asst. U.S. Atty., Harvard University, Office of General Counsel, Cambridge, MA, for Harvard College.

*MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT*

STEARNS, District Judge.

In this somewhat unusual case, two Harvard College students, suspended by the school's disciplinary board after having been found guilty of stealing money from Harvard Student Agencies (HSA), a student-run business, are asking that the College nonetheless be ordered to award them their degrees.[1] Plaintiffs argue that the sanction imposed was disproportionate to the offense, and will cause them irreparable harm in terms of their future employment prospects, immigration status, and the likelihood of being called to serve in their respective country's armed forces.[2] As the court observed at the hearing, one can take very differing approaches to the case, by analyzing it as a garden variety contract dispute, or more abstractly, by viewing it through the prism of a university's relationship with, and responsibility for, its students. Plaintiffs urge the contractual approach, while Harvard is indifferent to the choice, believing that it has a strong argument on either ground.

■ The contract which the students allege was breached is based on a Handbook for Students, published by the College and issued to each student admitted to study. The 1998–1999 Handbook, as its preface states, "contains a concise review of the rules and procedures of Harvard College with which students are expected to be familiar," including for present purposes, the specific requirements for an arts or sciences degree and a description of disciplinary procedures and sanctions tied to infractions of the College's code of conduct.[3] That the relationship between a university and its students has a strong, albeit flexible, contractual flavor is an idea pretty well accepted in modern case law. See, e.g., *Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir.1998). So too, is the proposition that a student handbook, like the occasional employee handbook, can be a source of the terms defining the reciprocal rights and obligations of a school and its students. See *Corso v. Creighton University*, 731 F.2d 529, 532–533 (8th Cir.1984). Cf. *O'Brien v. New England Telephone & Telegraph Co.*, 422 Mass. 686, 692–693, 664 N.E.2d 843 (1996).

The train of events that led to plaintiffs being denied their degrees began with a December 7, 1998 letter from the interim general manager of HSA to the Dean of Harvard College expressing concern that plaintiffs had accepted money for work they had not performed. The matter was

---

1. The students do not concede guilt, but recognize that for purposes of this motion, the court must construe that fact in Harvard's favor.

2. Plaintiff Dinu is a citizen of Romania. Plaintiff Tsoukalidis is a citizen of Greece.

3. The 1998–1999 edition of the Handbook states that "instances of theft, misappropriation, or unauthorized use of or damage to property or materials not one's own will ordinarily result in disciplinary action, including requirement to withdraw from the College." Id. at 307.

referred to the Administrative Board (a disciplinary agency composed of senior administrators, faculty members, Senior Tutors and Assistant Deans of Freshmen) which appointed a committee to investigate. On May 24, 1999, the committee's incriminating report was submitted to the Board. On June 1, 1999, the Board found against the plaintiffs and required them to withdraw from the College for one year. As a result, the plaintiffs were not permitted to participate in Harvard's June 10, 1999 commencement. The June 1 date is important to plaintiffs' argument, because they maintain that they had completed their degree requirements prior to the Board's action (May 25 in Tsoukalidis's case, May 28 in Dinu's case).

The Handbook for Students outlines a structure of escalating penalties which the Administrative Board can impose in disciplinary cases, ranging from the mildest sanction of a warning or admonishment to the most extreme of dismissal or expulsion.[4] The two intermediate sanctions in ascending degrees of seriousness are disciplinary probation and requirement to withdraw. These are described in the following terms.

2. *Disciplinary Probation:* a strong warning to a student whose conduct gives serious cause for concern. Probation is a formal disciplinary action of the College and becomes part of the student's official record.

During the period of time (to be specified by the Board) that a student is on probation, any further instance of misconduct will cause the Board seriously to consider requiring the student to withdraw from the College. A student on probation must be especially conscientious about his or her behavior and responsibilities. If the offense is related to participation in extracurricular activity, the Board may at its discretion restrict such participation; in cases in which management of time appears to contribute to the problem, the Board may require that the student obtain the Board's permission for participation in each individual activity. The Board may also attach additional requirements to probation. It is the Board's hope that the structure imposed by probation will help the student amend his or her conduct so as to meet the standards of this community. Failure to do so is a grave matter, ordinarily leading to further disciplinary action, including requirement to withdraw. A student placed on disciplinary probation is ordinarily relieved of probation at the end of a set period of time (specified by the Board in its decision), if he or she has maintained satisfactory conduct.

*A student on probation may not receive a degree until she or he has been relieved of probation by the Administrative Board.* [Emphasis added].

3. *Requirement to Withdraw for Disciplinary Reasons:* action taken in serious disciplinary cases indicating that the student's behavior is unacceptable in this community. Requirement to withdraw is a formal disciplinary action of the College and becomes part of the student's official record. Requirement to withdraw ordinarily is effective immediately upon vote of the Administrative Board.

.     .     .     .     .

A student who is required to withdraw for disciplinary reasons is not in good standing until readmitted. In order to be readmitted, the student ordinarily must have been away from the College for at least one but ordinarily two or more full terms and must have shown an acceptable record of performance during a substantial period (at least six consecutive months) of regular employment. Without exception, students who have been required to withdraw must petition the Board to be readmitted to the Col-

---

4. These are essentially the same penalties, although a student who is dismissed can be readmitted to the College by a vote of the faculty.

lege, and the Board's decision will depend on its judgment of the student's readiness to rejoin the College community.

Handbook for Students, at 320–321.

Plaintiffs' argument can be summarized as follows. The Handbook for Students, under the caption "Requirements for the Degree," lists seven such requisites, most involving the College's curriculum. Id. at 28–43. Nowhere in this discussion is it explicitly said that a student must be in good standing to graduate.[5] Speaking contractually, plaintiffs argue that because they had satisfied the formal requirements for a degree prior to the Board's action, their right to a degree had vested, and the Board was powerless to punish their misconduct by withholding their diplomas.[6] This would be true, according to plaintiffs' argument, whether the misconduct in question occurred before or after the date upon which Harvard's obligation to perform under the contract (by tendering the degrees) came due. This is so, plaintiffs contend, because having kept their end of the bargain, they had ceased to be members of the Harvard "community," and thus were no longer subject to its disciplinary jurisdiction. See Plaintiffs' Memorandum, at 13–14 nn. 15, 16.[7] Alternatively, plaintiffs base a less ambitious argument on principles of contract construction and the rule that an ambiguous term in a contract document will ordinarily be construed against the party that authored it. *Merrimack Valley National Bank v.*

*Baird,* 372 Mass. 721, 724, 363 N.E.2d 688 (1977). More specifically, plaintiffs point to the fact that while it is clear from the text of the Handbook that a student who is placed on disciplinary probation may not receive a degree, no similar provision appears in the text describing the consequences of a disciplinary requirement to withdraw. Thus, even if the Board had the power to impose the punishment that it chose, the sanction by its own terms does not encompass the withholding of a degree.

■ Accepting (as the parties do) the contractual premise of the dispute, the standard to be applied is one of "reasonable expectations"—"what meaning the party making the manifestation, the [U]niversity, should reasonably expect the other party to give it." *Cloud v. Trustees of Boston University,* 720 F.2d 721, 724 (1st Cir.1983), quoting *Giles v. Howard University,* 428 F.Supp. 603, 605 (D.D.C.1977). Counsel for Harvard framed the test in the context of this case very neatly at oral argument in asking the question: "Could a student upon reading the disciplinary provisions of the Handbook reasonably believe that a student required to withdraw would nonetheless (had he finished the curriculum requirements) be entitled to receive his degree?" The answer would plainly seem to be no, and for the following reasons. A reasonable Harvard College student would recognize the fact (if only from his more junior days as a pupil) that a school has an inherent, if circumscribed,

---

5. Plaintiffs point out that at other places in the Handbook, the College specifically reserves the right to withhold or rescind a degree for nonpayment of tuition or fees, for falsifying admissions materials, or for being placed on academic or disciplinary probation. Plaintiffs' Memorandum, at 13.

6. It does not appear from the record that the Administrative Board specifically ordered that plaintiffs' degrees be withheld as part of their punishment. Rather, it appears that the degrees were withheld pursuant to a College policy of refusing degrees to students who are not in good standing. According to the Dean of Harvard College, the Faculty of Arts and

Sciences has never awarded a degree to a student who was not in good standing. Affidavit of Harry R. Lewis, ¶ 8.

7. Plaintiffs concede that had the Board acted prior to May 25, it would have had the authority to withhold their degrees. While a difference of five or six days may seem arbitrary, as plaintiffs pointed out at oral argument, strict and enforceable time limits are an element of most contracts. In any event, plaintiffs say the delay should be attributed to inaction on Harvard's part and not to anything of their own doing. Plaintiffs' Memorandum, at 1 & n. 2.

right to regulate student conduct. Cf. *Coveney v. President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 19, 445 N.E.2d 136 (1983) ("Violations of reasonable rules and regulations of a school are a recognized ground for dismissal of a student").[8] This same hypothetical student would also accept the fact that theft, as the Handbook clearly warns, is an example of the type of conduct that would (and should) lead to the forced separation of a student from the College or perhaps, in less egregious cases, to disciplinary probation. Knowing from the Handbook that a person placed on disciplinary probation is not eligible to receive a degree until the probationary term is lifted, it would be a matter of illogic to suppose that a person subject to an even harsher form of discipline, requirement to withdraw, would be entitled to more indulgent treatment even though banished from the College.[9] Moreover, learning from the Handbook that a student under a requirement to withdraw is "not in good standing until readmitted," a reasonable student would draw the not unreasonable inference that a person who is deemed "not presently admitted" to the College is ineligible to claim a degree until his enrollment status is restored.

■ The fundamental flaw in plaintiffs' argument is its assumption that a student who completes his course work ceases to be a "student" subject to the College's disciplinary code while awaiting the award of his degree. Harvard answers this proposition with a logic that is unassailable. "Assume, for example, that a senior completes his course work, learns that he will not graduate with honors, and, in a rage, attacks the chair of his department. Plaintiffs cannot seriously suggest that Harvard would be powerless to enforce its disciplinary r[u]les in that instance." Defendants' Memorandum, at 10–11. Har-

vard brings to my attention a case, which while old, is perhaps the wiser for being so.

> It cannot be that a student having passed all examinations necessary for a degree can, before his graduation, excite disturbance and threaten injury to the school or college without being amendable to some punishment. No course would seem open except to forthwith expel him or refuse his degree.... The faculties of educational institutions having power to confer degrees ... are necessarily vested with a broad discretion as to the persons who shall receive those honors.... Any other rule would be subversive of all discipline in the schools.... We see no reason why the right to discipline is not as great between the final examination and the graduation as before....

*People ex rel. O'Sullivan v. New York Law School*, 22 N.Y.S. 663, 665 (N.Y.Sup.Ct. 1893). While it is not difficult to imagine cases in which a school might improperly withhold a degree for impermissible reasons, see *DeMarco v. University of Health Sciences*, 40 Ill.App.3d 474, 352 N.E.2d 356 (1976), this case is manifestly not one of them. Harvard is thus entitled to summary judgment as a matter of law on Count I of the Complaint. See *Giles v. Howard University*, supra, at 605 ("Contract interpretation is a function of the court where, as here, no extrinsic evidence is necessary to determine an agreement's meaning and/or the meaning is so clear that reasonable men could reach only one conclusion").

### ORDER

For the foregoing reasons, plaintiffs' motion for Summary Judgment as to Count I of the Complaint is *DENIED*. Defendants' Cross Motion for Summary

---

8. A sophisticated reasonable student would also appreciate the fact that the rights of a private college are more expansive in this regard than are those of a public institution.

9. A student required to withdraw is not permitted to enter upon the Harvard campus until readmitted.

Judgment is *ALLOWED* as to Count I of the Complaint.

SO ORDERED.