Russell GORMAN, Jr. et al.

v.

ST. RAPHAEL ACADEMY.

No. 2003–371–Appeal.

Supreme Court of Rhode Island.

July 15, 2004.

James P. Howe, Esq., Providence, for Plaintiff.

Joseph V. Cavanagh, Jr., Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

SUTTELL, Justice.

By all accounts, Russell Gorman III is an exemplary student at Saint Raphael Academy. During his freshman year, he was an honors student, incurred no disciplinary infractions, played freshman basketball, and was a member of the Ambassador's Club, in which he would help out with open house and visit middle schools, literally, as an ambassador for Saint Raphael. Yet, in his second or third week of school, he faced expulsion—his only offense being the length of his hair.[1]

Unwilling to trim his locks and unable to untangle the disciplinary snarl with school officials, Russell and his parents filed a breach of contract action against Saint Raphael. The Superior Court granted a preliminary injunction, and eventually a permanent injunction, restraining and enjoining the school from suspending, expelling, or otherwise disciplining Russell from wearing his hair so that it falls below the bottom of his shirt collar. The trial justice found the school's hair-length rule to be arbitrary on its face because it bore no rational relationship with the mission statement of Saint Raphael's. We reverse the judgment of the Superior Court. Because Saint Raphael is a private school and accorded by law wide latitude in promulgating its own rules, regulations and codes of conduct and, further, because there has been no showing that the hair-length regulation is against any law or public policy, we hold that the regulation is a lawful and enforceable term of the school's educational contract with its students and their parents.

### Facts and Travel

Saint Raphael Academy (Saint Raphael) is a Catholic, coeducational, college prepa-

---

1. Russell Gorman wears his hair in a mullet style, where his hair is closely cropped on the top and sides of his head, but six to eight inches below his shirt collar in the back.

ratory school for grades 9–12 in Pawtucket, Rhode Island. Saint Raphael has almost 500 students and is operated by the Brothers of the Christian Schools with almost sixty lay faculty and staff members. It traces its educational tradition and mission to 1679, when John Baptist de La Salle opened his first school in Reims, France. As described in the student handbook, the Lasallian heritage is to address the educational needs of an economically diverse student body in a manner that is imbued with Christian spiritual values.

In the fall of 2000, plaintiff, Russell Gorman III (Russell), applied for admission to Saint Raphael. As part of the application process, Russell had an interview with school officials and visited the school several times with his parents. At the time, Russell's hair was six to eight inches below his shirt collar. No school official ever informed Russell or his parents that his hairstyle was unacceptable, or indeed commented on his hair at all. In January 2001, he received a letter of acceptance from the school principal, Brother Daniel Aubin, welcoming him to the Class of 2005.

Russell's freshman year at Saint Raphael began in August 2001. Shortly thereafter, school officials demanded that he cut his hair, and advised both Russell and his parents that he would be expelled if he failed to do so. After unsuccessfully attempting to resolve the matter, Russell and his parents, Kimberly Gorman and Russell Gorman, Jr., filed a complaint alleging breach of contract. On September 25, 2001, the trial justice granted a temporary restraining order enjoining Saint Raphael from interfering with Russell's normal matriculation and participation at

Saint Raphael based on the length of his hair.[2]

Near the end of Russell's freshman year, in May 2002, Brother Aubin revised the student handbook to include a hair-length regulation for boys. The 2002–2003 handbook provided in pertinent part:

"All students must keep their hair clean and well groomed. Outlandish hair styles (ex. Any designs, lettering, mohawks, ponytails, etc. engraved/cut into their hair; spiked; hair dye can only be of natural colors, [reds, blues, greens, etc. are not natural colors] are not in keeping with the school's educational mission and will not be tolerated. *A boy's hair may not be longer than the bottom of his shirt collar.* Hair should be neat and not flamboyant for all students. Students who do not conform to these regulations are subject to disciplinary action and possible dismissal if the problem persists." (Emphasis added.)

Brother Aubin testified that he relied on the handbook from Xaverian Brothers High School in Westwood, Massachusetts, where he had been Dean of Students from 1995 to 2000, as well as the 1999–2000 handbook for LaSalle Academy, in developing the rule for Saint Raphael. He further testified that he believed the existence of this regulation would promote a culture of calmness and order, thereby facilitating the school's mission. The school's mission statement found in the handbook said:

"Saint Raphael Academy is a Catholic coeducational, college preparatory school founded in the tradition of Saint John Baptist de La Salle and rooted in the gospel of Jesus Christ. The Academy welcomes a student body that is aca-

---

**2.** After Saint Raphael filed two objections to the form of the order, an amended order was filed on April 23, 2002.

demically, economically and culturally diverse. Through its commitment to Christian values, the Academy strives for excellence in all programs for the spiritual, academic, cultural and physical development of each student. Saint Raphael Academy seeks to provide a safe environment that places priority on mutual respect as well as self-discipline. The Academy prepares each student for a life dedicated to learning, leadership and service to the Church and community."

Saint Raphael asserts that Russell's attorney was notified in May 2002 of the pending change to the hair-length rule; the Gormans maintain, however, that they did not become aware of the revisions until June or July 2002 and did not receive the new handbook detailing the change until August 2002.

The Gormans filed an amended complaint on August 21, 2002, alleging breach of contract, and seeking injunctive relief allowing Russell:

> "to attend the school within the compliance and dictates of the 2001–2002 Student Handbook, or in the alternative, within all the dictates of the 2002–2003 Student Handbook (or further editions of the Student Handbook), excepting the provision with regard to the length of the hair of male students, until he graduates from St. Raphael Academy."

Before Russell's sophomore year began, the parties reached a verbal agreement permitting Russell to remain at Saint Raphael pending a final determination of the complaint, provided that he tucked his long, pony-tailed hair into his shirt collar.

In late 2002, hearings were held in which the trial justice entered judgment granting the permanent injunction. Additionally, the trial justice granted plaintiff's motion for attorney's fees of $1,505 for litigating the temporary restraining order

heard on September 14, 2002, and denied the motion for attorney's fees for the hearings held in late 2002 on the permanent restraining order. The order for costs was stayed pending this appeal.

Saint Raphael timely appealed, asserting that the trial justice erred multiple times: (1) by failing to apply contract law in reaching his decision; (2) by applying a rational relationship test and requiring defendant to prove that the hair-length policy was related to the educational process; (3) by improperly ascribing the burden of proof to defendant; (4) by finding that the rule was arbitrary and capricious without supporting evidence; (5) by improperly substituting his judgment for that of the administration of Saint Raphael; and (6) by erroneously disregarding the constitutional rights of parents who choose to educate their children at Saint Raphael. For the reasons stated in this opinion, we reverse the judgment of the trial justice.

## Standard of Review

■ "When reviewing a trial justice's issuance of a permanent injunction, this Court will overturn the justice's findings of fact only when they are clearly wrong or when the justice has overlooked or misconceived material evidence." *Board of Governors for Higher Education v. Infinity Construction Services, Inc.,* 795 A.2d 1127, 1129 (R.I.2002) (per curiam) (citing *Retirement Board of the Employees' Retirement System of Providence v. City Council of Providence,* 660 A.2d 721, 724 (R.I.1995)). We review questions of law de novo. *Id.* (citing *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I.2001)).

## The Contract Claim

Saint Raphael first argues that the trial justice erred by failing to properly analyze this case within Russell's single count for

breach of contract. The complaint did not specify what constituted the alleged contract or its alleged terms or what constituted the alleged breach. None of these details was clarified at trial. Saint Raphael asserts that the Gormans, to prevail, should have been required to prove the existence of a valid contract and that Saint Raphael breached one or more of its terms.

We first note that the trial justice made no findings with respect to the existence of a contract, but rather proceeded to evaluate the claim under principles of equity. Here, Saint Raphael denies the formation of a contract pertaining to Russell's sophomore year in 2002–2003. In May 2002, Mrs. Gorman paid the $250 enrollment fee and signed a tuition contract in which she agreed to its terms and acknowledged that the tuition contract, along with the contract in the student handbook, contained the entire agreement and understanding between the parties. Russell's parents later tendered a $3,000 tuition check, but they never signed the contract in the student handbook. Thus, defendant asserts, no valid contractual relationship ever was created between the Gormans and Saint Raphael for Russell's sophomore year.

■ Further, Saint Raphael argues that plaintiffs produced no evidence of a breach and, specifically, no evidence that Saint Raphael had agreed or was in any way contractually bound not to adopt, revise or enforce a hair code during Russell's matriculation. The trial justice commented:

"The contract questions, such as they are, surrounding this controversy are not complex, and the controlling law is well established. The application forms and school handbook, as well as the acceptance letter [ ] forwarded by Brother Aubin to the Gorman family, are all in evidence. It is clear from the acceptance letter that the parties at the time

intended that Russell Gorman, III would enter the 9th grade class and graduate with his fellow admittees four years later as the Class of 2005 of St. Raphael Academy."

We reject, however, any suggestion that the acceptance letter, together with any signed documents relative to Russell's freshman year, created an enforceable contract of a four-year duration. What is clear from the record is that Saint Raphael offered its students a one-year contract that was subject to renewal annually until the student graduated.

■ Here, the Superior Court failed to make the predicate findings of offer, acceptance, consideration and breach requisite to determining a breach of contract claim. We see no need, however, to remand the case so that the appropriate factual findings can be supplied. The existence of a valid contract for Russell's sophomore school year at the time of the hearings is now a moot issue. We have established that a case is moot "if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *In re New England Gas Co.*, 842 A.2d 545, 553 (R.I.2004) (quoting *Cicilline v. Almond*, 809 A.2d 1101, 1105 (R.I.2002) (per curiam)). Russell recently completed his junior year and will start his senior year this fall. Therefore, whether a valid contract existed for Russell's sophomore year was only a justiciable question at the time of his sophomore year.

Further, we agree with the trial justice that "the contract questions * * * are not complex." We also assume that, but for the hair-length provision, the Gormans are willing to enter into and abide by the terms and conditions of a contract with Saint Raphael for Russell's senior year in 2004–2005. The question now before us is

whether the trial justice erroneously granted the permanent injunction. Our review, therefore, must focus on the issue of whether a hair-length rule at a private school is permissible in the context of the educational contract that students enter into each year. This is a question of first impression in our jurisdiction. In fact, we have found no other published case from any other jurisdiction that examines the validity of a hair-length rule in a private educational institution.

### Private School Rules and Regulations

■ Numerous jurisdictions have held that a student and private university relationship is essentially contractual in nature, but recognize that the relationship has unique qualities, and thus does not require strict adherence to contract law. *See, e.g., Runyon v. McCrary,* 427 U.S. 160, 172, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Mangla v. Brown University,* 135 F.3d 80, 83 (1st Cir.1998); *Doherty v. Southern College of Optometry,* 862 F.2d 570, 577 (6th Cir.1988); *Corso v. Creighton University,* 731 F.2d 529, 531 (8th Cir. 1984); *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978) (the student-school relationship is unique and rigid application of contract law not appropriate); *Mahavongsanan v. Hall,* 529 F.2d 448, 450 (5th Cir.1976); *Dinu v. President & Fellows of Harvard College,* 56 F.Supp.2d 129, 130 (D.Mass. 1999) (the relationship between students and university has a "strong, albeit flexible contractual flavor"); *University of Mississippi Medical Center v. Hughes,* 765 So.2d 528, 534–35 (Miss.2000).

■ Because contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities. Courts have recognized that implicit in an educational contract is the right to modify disciplinary and academic rules and regulations. *See, e.g., Mahavongsanan,* 529 F.2d at 450 ("[i]mplicit in the student's contract * * * is the student's agreement to comply with the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility"). That a student handbook can be a source of the terms defining the reciprocal rights and obligations of a school and its students is also an idea fairly well established in modern case law. *See, e.g., Dinu,* 56 F.Supp.2d at 130 (citing *Corso,* 731 F.2d at 532–33). Courts normally construe educational contracts to allow the school administration flexibility in meeting its educational responsibilities. *See, e.g., Jones v. Howe Military School,* 604 F.Supp. 122, 125 (N.D.Ind.1984) ("contracts for education have unique qualities" and must "be construed in a manner which leaves the school sufficient discretion 'to properly exercise its educational responsibilities'", quoting *Jansen v. Emory University,* 440 F.Supp. 1060, 1062 (N.D.Ga.1977)).

■ In the case before us, the contractual relationship between a student, his or her parents and Saint Raphael is renewable annually by entering into a distinct and express contract for each academic year. As part of the educational contract, the student and parents agree to abide by the rules and regulations promulgated by the administration. The parents or guardians of the student are required to sign a tuition contract for the specific academic year, along with the student handbook each year. For example, the 2002–2003 tuition contract [3] stated in part:

---

**3.** The 2002–2003 student handbook contained the following contract, which must be signed

"This contract, *along with the Student Handbook,* contains the entire agreement and understanding between the parent(s) guardian(s) of the above-named student and Saint Raphael Academy with respect to the enrollment of said student. No representations, promises, agreements or understandings, written or oral, not contained herein shall be of any force or effect. No change or modification of this tuition contract shall be valid or binding unless it is in writing and signed by the party(s) intending to be bound." (Emphasis added.)

Clearly, therefore, the relationship between Saint Raphael and its students is contractual in nature.

### Rational Basis Test

We now turn to the issue of a private school's authority to adopt, revise, and enforce rules and regulations as part of the educational contract. Saint Raphael argues that the trial justice erred in applying a rational basis test to evaluate the lawfulness of the hair-length rule. The amicus curiae brief submitted by the Rhode Island Catholic School Parents Federation asserts that the trial justice implicitly, if not explicitly, premised his decision upon the conclusion that a secondary school student has a liberty interest in choosing his own personal appearance that warrants constitutional protection. We note that the Gormans did not make any constitutional claim, nor did they cite any cases recognizing the right of a student to wear long hair in a *private school* setting. The federal circuit courts are split on the issue of whether a hair-length policy even violates the constitutional rights of *public school* students. *See Massie v. Henry,* 455 F.2d 779, 783 (4th Cir.1972) (striking down hair-length regulation in public high school); *Bishop v. Colaw,* 450 F.2d 1069, 1077 (8th Cir.1971) (same); *Richards v. Thurston,* 424 F.2d 1281, 1286 (1st Cir. 1970) (same); *Breen v. Kahl,* 419 F.2d 1034, 1038 (7th Cir.1969) (same), *cert. denied,* 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); *cf. Freeman v. Flake,* 448 F.2d 258, 262 (10th Cir.1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972) (upholding hair-length regulations in public school); *King v. Saddleback Junior College District,* 445 F.2d 932, 940 (9th Cir.1971) (same), *cert. denied,* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1972); *Jackson v. Dorrier,* 424 F.2d 213, 215 (6th Cir.) (per curiam) (same), *cert. denied,* 400 U.S. 850, 91 S.Ct. 55, 27

---

by the student and his or her parents:
> "In consideration of the acceptance of the below named student by Saint Raphael Academy, we the undersigned parents and student, hereby acknowledge that we have read, and are in accord with, the contents of the PARENTS and STUDENT HANDBOOK.
> "It is our understanding that attending Saint Raphael Academy is a privilege which may be revoked at any time. By sending our son/daughter to the Academy, we agree that the Administrators of Saint Raphael Academy have the right to expect our child to comply with the rules and regulations as set forth in the PARENTS and STUDENT HANDBOOK. We also understand that such Administrators have the right to set policies and make decisions as they, in their exclusive discretion, find not only to be in the best interest of our child, but also in the best interests of the whole student body.
> "We do hereby contract with Saint Raphael Academy that we, the undersigned parents, will pay tuition and fees charged by the school for the 2001/02 [*sic*] school year on a timely basis.
> "* * *
> "We do hereby contract with Saint Raphael Academy that we, the undersigned parents and our son/daughter, will comply with the school rules and regulations, and that we, the parents as well as our child, will accept those decisions made by the school and the Administration."

L.Ed.2d 88 (1970); *Ferrell v. Dallas Independent School District*, 392 F.2d 697, 703 (5th Cir.) (same), *cert. denied*, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

The trial justice acknowledged in his decision that it was "beyond cavil that private schools can change their rules as they see fit from time to time, even during the period between the admission of a freshman class and its graduation four years later." He held that changes made to controlling rules and regulations, however, "should be enacted in good faith and not bespeak the arbitrary or capricious." Repeatedly noting that Saint Raphael had failed to produce evidence tending to prove that long hair worn by male students affects the educational process, discipline or decorum of the school, or that it has anything to do with the dogma or rules of the Roman Catholic Church, he ruled that the hair-length regulation was arbitrary and capricious because it bore no rational relation to the school's mission statement. We conclude, however, that the determination of what rules or policies comply with the school's mission statement is an exercise more appropriately and properly left to the school administration.

At the hearing, Brother Aubin testified that he became principal of Saint Raphael in August 2000. He has been involved at various educational institutions since 1973. He testified that when he arrived in 2000, he found the school lacking in discipline. He identified the biggest problems as lack of respect for teachers and a "tough element" of older students who were very cliquish. He said that the school had become very lax in enforcing disciplinary rules, including its dress code. All of which, Brother Aubin felt, was inimical to a common culture or sense of community.

Brother Aubin further testified that he set out to change the culture of Saint Raphael and create a sense of community and shared values that would provide a level playing field for all students, prevent distractions, promote a team spirit, and create a common value-based culture of calmness and order. We note that these goals are consistent not only with the school's mission statement, but also with the Lasallian heritage of Christian Brothers' schools. The Saint Raphael student handbook states "De La Salle regarded a school as a community of believers working cooperatively to achieve a shared vision."

Each year Saint Raphael publishes a student handbook that delineates its academic standards and policies that it deems not only to be in the best interest of the student, but also in the best interests of the whole student body. In a section entitled, "Regulations to Foster the Saint Raphael Academy Community," it sets forth various rules relating to attendance, conduct, discipline, appearance and its dress code. Students are expected to be "well-groomed," wear properly fitted uniforms, and refrain from the use of "vulgar, obscene or offensive language."

According to Brother Aubin, the adoption and enforcement of the hair-length regulation was part and parcel of the overall tightening up and stricter enforcement of rules concerning deportment to facilitate a common culture. He said that there had been hair-length regulations for male students at the schools where he previously served, and he consulted student handbooks at other Catholic schools. After Brother Aubin met with other school officials, the Saint Raphael student handbook for 2002–2003 was revised to include the provision that "a boy's hair may not be longer than the bottom of his shirt collar."

After reviewing the record and the evidence adduced at trial, we are unable to conclude that the hair-length regu-

lation was arbitrary or capricious or that it lacked a rational basis vis-à-vis the school's mission statement. More significantly, we hold that, absent a violation of law or public policy, it is not within the province of the court to inject itself in the rule-making authority of a private school.

■■■ Moreover, the trial justice improperly placed the burden of proof on defendant, Saint Raphael, to justify its hair-code policy and to produce evidence that its policy rationally related to its mission statement. Even if the arbitrary and capricious inquiry were the correct standard, the burden of proof in a breach of contract action rests with a plaintiff to show that a defendant breached the contract.

■■ We hold, however, that the arbitrary or capricious standard is not the proper test with which to evaluate the lawfulness of a rule or regulation in the private school context. Recognizing that private schools are voluntary associations, the trial justice applied the general principle articulated in *Hebert v. Ventetuolo*, 480 A.2d 403, 407 (R.I.1984), that there should be "no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion." In *Hebert*, 480 A.2d at 407, this Court examined a rule promulgated by the Rhode Island Interscholastic League, a voluntary association of public school principals, and upheld the league's ability to enact a rule governing the eligibility of public school transfer students to participate in interscholastic sports. This Court determined that the transfer rule that the league adopted was not arbitrary or capricious because it was designed to prevent the problems of school-jumping by athletes and the rule was related reasonably to that purpose. *Id.* In a later decision, this Court explicitly

clarified that "the existence of state action was implicit in our consideration of the constitutional issues raised in [*Hebert*]." *Kleczek v. Rhode Island Interscholastic League, Inc.*, 612 A.2d 734, 736 (R.I.1992) (per curiam).

■■ *Hebert*, however, is not controlling in an analysis of private school rules and regulations. A private school is not a state actor, and thus no governmental intrusion is implicated in the promulgation and enforcement of a private school's rules and regulations. *See Wisch v. Sanford School, Inc.*, 420 F.Supp. 1310, 1314 (D.Del.1976) (private high school that expelled student was not considered state actor even though school partially funded and regulated by the state); *Stock v. Texas Catholic Interscholastic League*, 364 F.Supp. 362, 364–65 (N.D.Tex.1973) (decision of private school accredited by state to terminate plaintiff student's participation in sports was not under color of state law, when state accreditation not connected with the challenged activity); *Morgan v. St. Francis Preparatory School*, 326 F.Supp. 1152, 1154 (M.D.Pa.1971) (private school's expulsion of student not considered state action); *Bright v. Isenbarger*, 314 F.Supp. 1382, 1398 (N.D.Ind.1970), *aff'd*, 445 F.2d 412, 413 (7th Cir.1971) (per curiam) (same).

Without specifically finding that Saint Raphael is a state actor, the trial justice noted that it, "like all private schools in Rhode Island, could not exist without the license and approval of the State of Rhode Island Department of Education," and that "there are a number of state imposed strictures to which a private school must adhere." He also said, "It is apparent, then, that private schools in Rhode Island share with public schools the important mandate of educating students to participate appropriately as citizens in a democ-

racy. In short, private schools discharge a crucial public responsibility."

Arguably, one of the most important functions of state government is "to secure to the people the advantages and opportunities of education * * *." R.I. Const., art. 12, sec. 1. To the extent that Saint Raphael, or any other private school, contributes to this effort, it indeed discharges a public duty. Nevertheless, absent a showing of substantial or significant involvement in the decision-making process of the private entity, state action is not implicated. *See, e.g., Wisch,* 420 F.Supp. at 1313 (citing *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) and *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

 Moreover, the Gormans never alleged in their complaint that Saint Raphael was a state actor, nor did the trial justice make such a finding. In the case of a private high school, the state nexus requirement that triggers the application of the Fourteenth Amendment is not readily met. The constitutional due process and equal protection rights are intended to protect citizens against unwarranted interference and oppression by the government, not to afford protections against one's own voluntary contractual agreements. *See North Dakota v. North Central Ass'n of Colleges and Secondary Schools,* 23 F.Supp. 694, 700 (E.D.Ill.), *decree aff'd by,* 99 F.2d 697, 700 (7th Cir.1938). We conclude, therefore, that the trial justice improperly applied the arbitrary/capricious standard.

### Public Policy Considerations

We hold, rather, that the appropriate inquiry is whether the term at issue in a contract involving a private educational institution is contrary to law or public policy. It is a general rule of contract law that " 'competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts[ ] unless a violation of the law or public policy is clear and certain.' " *Wechsler v. Hunt Health Systems, Ltd.,* 216 F.Supp.2d 347, 354–55 (S.D.N.Y.2002) (quoting *Wheelabrator Environmental Systems, Inc. v. Galante,* 136 F.Supp.2d 21, 30 (D.Conn.2001)).

"A voluntary association may, without direction and interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them." *Edwards v. Indiana State Teachers Association,* 749 N.E.2d 1220, 1225 (Ind.Ct. App.2001) (quoting *State ex rel. Givens v. Superior Court of Marion County,* 233 Ind. 235, 117 N.E.2d 553, 555 (1954)). This "rule of non-interference reflects an appreciation for the 'contractual' nature of membership in voluntary associations." *Id.* at 1226.

The relationship between a private educational institution, such as Saint Raphael, and its students and their parents is a voluntary contractual relationship. The activities of the individual members of the educational community are directed and influenced by the institution's educational policies and educational goals. Generally, private schools, as do most schools, strive to provide an education beyond academic scholarship. In Saint Raphael's case, it expresses its mission as preparing "each student for a life dedicated to learning, leadership and service to the Church and community." It further proclaims as a goal "the education of the whole person."

Private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives. These rules and regulations generally are binding on those who wish to remain members, provided however, that said rules do not conflict with public policy. *See, e.g., Schoppelrei v. Franklin University,* 11 Ohio App.2d 60, 228 N.E.2d 334, 336 (Ohio Ct.App.1967) (absent a clear abuse of discretion by the school in the establishment and enforcement of its policies and regulations, courts will not interfere in these matters).

In Rhode Island, it is firmly established that a contract term is unenforceable only if it violates public policy. *City of Warwick v. Boeng Corp.,* 472 A.2d 1214, 1218 (R.I.1984). As discussed above, the student/school relationship is a contractual one, and thus we find this rule applicable.

We extend this rule to hold that a contractual rule or regulation of a private school is lawful and enforceable as long as it is not against public policy or law. It is well established that in Rhode Island a contract violates public policy only if it is: "[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression." *Id.* We adopt the same standard to private school contracts to determine whether a promulgated rule or regulation is lawful.

The Gormans did not offer any evidence that a private school rule regulating the length of a student's hair is injurious to the interests of the public, nor that it interferes with the public welfare or safety. This rule clearly does not rise to the level of "unconscionable," nor does it tend to injustice or oppression. The Gormans failed to adduce evidence of a violated contractual right or evidence that the hair-length rule is contrary to public policy of the State of Rhode Island. We hold, therefore, that Saint Raphael's adoption of a regulation concerning the length of hair of male students was a valid exercise of its discretionary authority and an enforceable provision of its educational contract with students.

## Freedom of Association

Saint Raphael also asserts that the parents of the other students have a First Amendment right of association to send their children to an educational institution that imposes strict rules to further a belief in community and teamwork and to discourage displays of individuality. In light of our conclusion in this case, however, it is unnecessary to examine the constitutional argument. We "will refrain from passing on a constitutional question when it is clear that the case before us can be decided on another point and that a determination of such a question is not indispensably necessary for a disposition of the case." *Rock Ridge Limited v. Assessor of Taxes,* 667 A.2d 778, 780 (R.I.1995) (per curiam) (quoting *McGee v. Stone,* 522 A.2d 211, 215 (R.I.1987)); *see also NAACP v. Alabama,* 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

For the reasons stated herein, we reverse the judgment of the Superior Court, to which we return the papers in this case. We are mindful that Russell Gorman is a good student with a promising future, and we encourage him to complete his senior year at Saint Raphael.

Justice FLAHERTY did not participate.