# United States Court of Appeals
## For the First Circuit

No. 16-1954

JANE DOE,

Plaintiff, Appellant,

v.

BROWN UNIVERSITY, in Providence in the state of Rhode Island and
Providence Plantations; MELISSA CLARK, individually and as an
agent of BROWN; MARGARET KLAWUNN, individually and as an agent
of BROWN; and CHRISTOPHER DENNIS, individually and as an agent
of BROWN,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

---

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

---

Philip Byler, with whom Nesenoff & Miltenberg LLP and Samuel
D. Zurier were on brief, for appellant.
Thomas R. Bender, with whom Beverly E. Ledbetter and the
Office of General Counsel, Brown University, were on brief, for
appellees.

---

November 22, 2019

---

**HOWARD**, **Chief Judge**.   Jane Doe[1] brought suit against Brown University ("Brown") and three of its employees, alleging a number of contract and tort claims arising from Brown's sanctions against her for her second violation of the University's Code of Academic Conduct ("the Code").  The district court entered summary judgment in Brown's favor, which Doe now appeals.[2]  We affirm.

## I.

Because Doe appeals a grant of summary judgment, we present the facts in the light most favorable to her, the non-moving party.  See Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 420 (1st Cir. 2014).  Doe studied at Brown as an undergraduate from the fall semester of 2010 through her graduation in the spring semester of 2014.  In 2013 -- the fall semester of Doe's senior year -- she enrolled in Public Health 320, a course taught by Professor Melissa Clark, one of the defendants here.  Professor Clark's course included a two-part midterm examination consisting of an in-class multiple-choice examination, as well as

---

[1] The district court granted Doe's *ex parte* motion to file her complaint pseudonymously, and Doe remains anonymous at this stage, because the district court entered judgment against her without reaching the merits of her continued anonymity.  See Doe v. Brown University, 209 F. Supp. 3d 460, 466 n.2 (D.R.I. 2016). No party has asked that this status be altered.

[2] Doe does not appeal the district court's grant of summary judgment as to her claims directed against the defendants named in their individual capacities.  Accordingly, the only remaining claims are against Brown and the remaining individual defendants in their alleged capacities as agents of Brown.

a take-home exam that included four essay questions ("the take-home" or "the exam"). While grading the take-home exams, a teaching assistant noticed similarities between Doe's answer to the exam's fourth question ("Question 4") and that of T.L., another student in the class.[3] The assistant alerted both Doe and Professor Clark. Doe met with Professor Clark the next day, and, according to Doe, she "readily admitted" in that meeting "that she and other students, including T.L., had collaborated on the [e]xam." Doe also explained to Professor Clark that "the majority of the students in the class had worked in groups" on the exam, and that this collaboration was in line with Professor Clark's "regular[] encourage[ment of] such collaboration and group discussions in her course."

A few days later, Doe received an email explaining that she would need to meet with Christopher Dennis, the Deputy Dean of the College (and another defendant in this case) about her exam. At the meeting with Dean Dennis, Doe again acknowledged her collaboration with T.L.

In December 2013, Brown notified Doe that it had assigned her matter to the university's Committee on the Academic Code ("the Committee") for a hearing. Before the hearing, Doe submitted a written statement to the Committee in which she acknowledged that

---

[3] The two answers are reproduced in the Appendix to this opinion.

"after comparing my [take-home exam] with the other individual [T.L.], there are similarities between the two for question #4." Doe further explained that "it was late at night, and I was suffering from fatigue . . . . I was struggling on coming up with innovative ideas for [Question 4]. I used [T.L.'s] suggestions, and when she was explaining them to me, . . . the thoughts of whose were whose was blurred." Doe's statement concluded with a request that the Committee "understand where I am coming from and forgive me for my mistake."

At the hearing, Doe chose not to call any witnesses, opting instead to admit to and to apologize for having relied on T.L. in answering question #4. See Doe, 209 F. Supp. 3d at 474. Neither Professor Clark nor T.L. appeared as witnesses against Doe. Id.

The Committee concluded that "by making unauthorized use of the work of another" on the exam, Doe violated Brown's Academic Code. After considering that this was Doe's second violation of the Code,[4] the Committee assessed the following sanctions: (1) a one-semester suspension, including termination of university

---

[4] In 2012 -- the fall semester of Doe's junior year -- Doe admitted to plagiarizing portions of her final projects for two courses. As she did here, Doe submitted a statement to the Committee acknowledging and apologizing for her Code violations before her formal hearing took place. The Committee sanctioned her with transcript notations of "directed no credit" for both courses; those notations were removed in the fall of Doe's senior year.

access and related privileges; (2) notations on her academic transcript about the suspension stating "directed no credit in Public Health 320," and "violation of the Academic Code"; (3) parental notification; and (4) the denial of any future institutional letter of support, or alternatively a discussion of Doe's offense in all such letters.

Doe appealed the Committee's decision to defendant Margaret Klawunn, Brown's Vice President for Campus Life and Student Services, in January 2014. Ten days later -- one day after the start of the spring semester -- Klawunn issued a decision affirming the Committee's decision and sanctions. Doe then transferred to Rhode Island College for her final semester. After completing her remaining credits there, Doe timely graduated from Brown with her class.

In June 2015, Doe filed a thirteen-count complaint against Brown and the three individual defendants alleging various tort and contract claims. The crux of Doe's theory underlying her claims was that Brown's disciplinary process in her case was deficient and biased when compared to the procedures prescribed under the Academic Code, and further, that Brown had imposed overly punitive sanctions for Doe's violation. The defendants filed a motion to dismiss that included several attachments and the district court, after giving Doe the opportunity to submit additional documents and affidavits for consideration, converted

the motion into one for summary judgment. See Fed. R. Civ. P. 12(d). Doe requested additional discovery. See Fed. R. Civ. P. 56(d).

On June 27, 2016, the district court entered a judgment dismissing Doe's claim for unreasonable publicity to one's private life and granting summary judgment to the defendants on all remaining claims.[5] Doe, 209 F. Supp. 3d at 479. The court also denied Doe's request for additional discovery. Id. at 479 n.14. This appeal followed.[6]

**II.**

**A.    Summary Judgment**

We turn first to Doe's challenges to the district court's entry of summary judgment with respect to her claim alleging breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, negligence, and negligent misrepresentation claims. We review the entry of summary judgment de novo. Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014).

---

[5] Prior to the district court's decision, Doe withdrew her claims for negligent infliction of emotional distress against all defendants.

[6] Doe does not appeal the district court's grant of summary judgment as to her unreasonable publicity, intentional infliction of emotional distress, and tortious interference claims, all of which were directed against the individually named defendants.

### 1. Breach of Contract

Under Rhode Island law, the relationship between a student and a private university is based in contract. See Gorman v. St. Raphael Acad., 853 A.2d 28, 34 (R.I. 2004). The parties agree that "[t]he relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007). "Because contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." Gorman, 853 A.2d at 34. We interpret the Code's terms "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." Havlik, 509 F.3d at 34 (citing Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)).

Against this backdrop, we begin our examination of Doe's arguments. To prevail on the merits, she would need to establish a typical breach of contract claim, which requires: (1) that a contract existed; (2) that there was a breach of the contract; and (3) that the breach caused the plaintiff damages. See Petrarca v. Fidelity and Cas. Ins. Co., 884 A.2d 406, 410 (R.I. 2005). To fend off summary judgment, however, she need show only that there is a genuine dispute of material fact that she could establish all

of the necessary elements of the alleged breach. Walker v. President & Fellows of Harvard Coll., 840 F.3d 57, 60 (1st Cir. 2016). Doe argues that the district court erred in granting summary judgment to Brown on her breach of contract claims because her complaint illustrates numerous ways in which Brown violated the Code in her disciplinary case. Specifically, Doe claims that Brown (1) failed to provide her with copies of the work in question; (2) failed to provide her with a list of faculty advisors to consult prior to her hearing; (3) failed to provide her with notice of the charges against her; (4) denied her the right to present witnesses in her case; and (5) denied her the right to examine witnesses against her and dispute the evidence against her.

These assertions do not withstand close scrutiny. For starters, the Code does not mandate that Brown supply an accused student with copies of the exam in question. (Even so, Doe did, in fact, review copies of her own exam, as well as those of some of her fellow students before her disciplinary hearing.) Moreover, the Code allows the student to offer evidence and witnesses in her support. Yet Doe offers no arguments to explain how, if at all, Brown precluded her from satisfying this burden. There is no evidence that Doe was prevented from calling any witnesses, and the University did not call any witnesses itself. Thus, there

were no "witnesses against Doe" for whom she was denied any cross-examination right.

Doe's arguments that Brown violated the Code by failing to present her with a list of potential advisors and failing to provide her with notice of the charges against her merit more discussion. The Code requires that Brown, through a Case Administrator,

> shall, as soon as possible, notify the accused student of the specific charge(s) of dishonesty, the time and place of the hearing, the nature of the evidence that will be presented against the student, and the range of penalties that may be imposed if the Committee finds that academic dishonesty has occurred.

Further, the Code states that the Case Administrator "will provide the accused student with a list of persons . . . who . . . can provide knowledgeable advice." We make several assumptions, all in Doe's favor: The first is that the Code does require repeated notice that Brown will provide students with a list of such persons. The second is that Brown was required to give her such a list during the 2013 disciplinary process, regardless of her earlier discipline. The third is that despite her conversations with Professor Clark the day after the exam and her meeting with Dean Dennis, she was not given formal notice of the charges before the hearing.

Even assuming that these failures constitute breaches of the Code on the part of Brown, however, we struggle to see the causal connection between those breaches and Doe's alleged damages, which include the academic sanctions against her. See Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1191 (R.I. 1994) ("There is a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss." (quoting 3 Farnsworth, Farnsworth on Contracts, § 12.1 at 148 (1990)) (alteration adopted)). This is because Doe herself, on multiple occasions, admitted to facts giving rise to a Code violation.

The Code states that "[a] student who obtains credit for work, words, or ideas that are not the products of his or her own effort is dishonest and in violation of Brown's Academic Code." While the Code acknowledges that individual instructors may sometimes permit students to work together on academic assignments, it states that "such efforts must be clearly marked as the results of collaboration." Doe first acknowledged that she collaborated with T.L. on the exam in her meeting with Professor Clark, then in her meeting with Dean Dennis, a third time in her letter to the Committee, and finally at her disciplinary hearing. However, neither Doe nor T.L. marked her exam as being the result of a collaboration. And that was a violation of the Code that Doe

has made no effort to dispute at any stage of her academic or legal proceedings.

Doe urges us to focus exclusively on Brown's procedural deficiencies. She argues that she would have accepted faculty assistance if Brown had offered it, and that if she had received assistance and proper notice, then she would have more vigorously rebutted the charges against her, including, then, by explaining that she had contributed to T.L.'s answer to Question 4 just as much as T.L. contributed to her own answer.

Even so, none of Doe's proffered alternative courses of action gives rise to disputed facts suggesting a link between Brown's procedural failures and Doe's alleged damages. That is so because Doe's admissions of the facts supporting the sanctions that she received predate the institution of any formal process against her. In her December 2, 2013 meeting with Professor Clark, Doe "acknowledged her collaboration with a group of other students," to include T.L. She repeated this acknowledgement in a subsequent meeting with Dean Dennis. The record thus indicates that, between Doe's admissions and the almost-identical answers of Doe and T.L. on Question 4 that included no acknowledgement of the collaboration between the two students, Doe has failed to provide facts on which a reasonable jury could find that the Committee's result would have changed had Brown complied with the Code's procedural provisions even assuming they require a subsequent

disciplinary proceeding to provide notice and information previously provided. See Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009) ("A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Once the process began, Doe could reasonably be expected to navigate it with some skill even without an advisor, given that this was her second time through. The district court therefore properly granted summary judgment to Brown on Doe's breach of contract claims.

## 2. Breach of the Implied Covenant of Good Faith and Fair Dealing[7]

Doe's next set of challenges looks outside the plain letter of the Code to claim that Brown breached its implied duty of good faith and fair dealing, which exists in every contract under Rhode Island law.[8] See Mangla, 135 F.3d at 84 (citing A.A.A.

---

[7] The district court entered summary judgment on Doe's implied covenant of good faith and fair dealing claim on the grounds that Doe "ha[d] pleaded no facts that would attribute bad faith or unfair dealing to Brown." Doe, 209 F. Supp. 3d at 476. It analyzed the alleged violations discussed here as part of its breach-of-contract analysis. Id. at 474-76. Because we agree with Doe that these claims exist outside of the explicit promises enumerated in the Code, we analyze them separately.

[8] Doe argues separately that Brown acted arbitrarily and capriciously in the same instances she draws upon in support of these implied covenant claims. See King v. Grand Chapter of R.I. Order of E. Star, 919 A.2d 991, 998 (R.I. 2007) (noting that review of a private organization's application of its rules is reviewed under an arbitrary and capricious standard). Not only are these

- 12 -

<u>Pool Serv. & Supply, Inc.</u> v. <u>Aetna Cas. & Surety Co.</u>, 395 A.2d 724, 725 (R.I. 1978)). But as we have noted before, "[g]ood faith and fair dealing cannot be separated from context, . . . and in evaluating those covenants in the educational milieu, courts must accord a school some measure of deference in matters of discipline." <u>Havlik</u>, 509 F.3d at 35; <u>see</u> <u>Gorman</u>, 853 A.2d at 39 ("Private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives.").

Broadly, Doe presents two challenges. First, she maintains that Professor Clark's collaboration policy was "[v]ague, [i]nconsistent, [and] unfair," and that Brown did not thoroughly investigate this policy before determining that Doe violated the Code. This argument misses the mark in light of the undisputed facts. Even if Professor Clark had explicitly allowed students to work in groups on the exam, there is no reasonable basis to conclude that when Doe submitted an answer nearly identical to T.L.'s without indicating that it was the result of collaboration, she did not commit a Code violation.

---

claims redundant, but they were also not sufficiently developed in Doe's complaint or in her briefs to be preserved on appeal. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Second, Doe argues that Brown breached the covenant in its proceedings against her. To start, she claims that Brown selectively enforced the Code against her but did not punish other similarly-situated students, which amounted to arbitrary, bad faith behavior. But she offered no evidence of this, and the record reveals that indeed, one other student -- T.L. -- was sanctioned for Code violations on the same exam.

Next, Doe asserts that bias infected both the conduct of her hearing and the ultimate punishment that she received.[9] This argument also fails. Doe claims bias because two of the same faculty members that were on the Committee for her first violation sat on her second panel, which led "to a predisposition against" her. The Code, however, does not prohibit such Committee-member overlap, and in her letter to Doe denying Doe's appeal, Dean Klawunn stated:

> In Academic Code cases, the Case Administrator does not inform the Committee of prior offenses until the Committee has made their decision. The process was followed with your hearing. In fact, the two Committee members from your previous case did not remember that they had heard your previous

_____

[9] Doe also argues that there was an "unreasonable delay" in Dean Klawunn's appeal decision, which was issued ten days after she submitted her appeal. Doe does not allege any facts from which a reasonable factfinder could determine that taking ten days to review and uphold a decision that represented the culmination of a three-week hearing process was arbitrary or in bad faith. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

- 14 -

> violation from fall 2012 until they were told about the prior violation.

Doe has presented no evidence to refute the veracity of this letter's assertion.

Doe also asserts that Brown's imposition of a lower sanction against T.L. than against her is the result of bias. Yet unlike T.L., she was sanctioned for her *second* Code violation. The Code expressly contemplates higher penalties for repeat offenses. In the absence of any additional facts, Doe has not shown that Brown acted arbitrarily or in bad faith. See Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007) ("[C]onjecture cannot take the place of proof in the summary judgment calculus.") Accordingly, as Doe has made no showing that Brown's actions were anything less than a "valid exercise of its discretionary authority," Gorman, 853 A.2d at 39, it follows that Brown was entitled to summary judgment on her covenant of good faith and fair dealing claim.

### 3. Remaining Claims

After a careful examination of the record, we affirm the district court's entry of summary judgment on Doe's promissory estoppel, negligence, and negligent misrepresentation claims, substantially on the basis of the district court's opinion. See Doe, 209 F. Supp. 3d at 476-78; see also Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013) ("[W]hen a trial court accurately takes

- 15 -

the measure of a case, persuasively explains its reasoning, and reaches a correct result, it serves no useful purpose for a reviewing court to write at length in placing its seal of approval on the decision below."). We note that the promissory estoppel claim fails because, although Brown promised to academically support Doe, it never promised "to look the other way if Jane Doe decided to cheat." Doe, 209 F. Supp. 3d at 476-77. Her negligent misrepresentation claim fails because she presents no evidence that she relied to her detriment on promises made by the school. Id. at 477-78. And, finally, her negligence claim fails for the same reason her contract claims fail: Doe cannot demonstrate that the harm to her would not have occurred but for any negligence by Brown.

## B.   Additional Discovery Under Rule 56(d)

Finally, we turn to the district court's denial of Doe's request for additional discovery under Rule 56(d), a ruling that we review for abuse of discretion. See In re PHC, Inc. S'holder Litig., 762 F.3d 138, 142-43 (1st Cir. 2014). To establish an entitlement to relief under Rule 56(d), the moving party must make an authoritative statement that:

> (i) explains . . . her current inability to adduce the facts essential to filing an opposition, (ii) provides a plausible basis for believing that the sought-after facts can be assembled within a reasonable time, and (iii) indicates how those facts would

- 16 -

> influence the outcome of the pending summary
> judgment motion.

Hicks v. Johnson, 755 F.3d 738, 742 (1st Cir. 2014) (quoting Velez v. Awning Windows, Inc., 375 F.3d 35, 40 (1st Cir. 2004)).

Doe argues that the district court wholly failed to address her 56(d) motion. Yet even a cursory review of the district court's opinion debunks this claim -- the court correctly concluded that further discovery would be fruitless. See Doe, 209 F. Supp. 3d at 479 n.14 ("[I]n light of the pleadings and evidence before the Court, further discovery would be futile."). By our lights, the record makes clear that Doe's and T.L.'s answers to the exam were nearly identical, and that Doe did not indicate her admitted collaboration with T.L. on her exam, as required by the Code. Therefore, additional discovery on any of the issues Doe raised in her request, specifically to include Professor Clark's collaboration policy and Brown's initiation of proceedings against other students (or lack thereof), would do nothing to undermine Doe's naked violation of the Code. Accordingly, we join the district court in concluding that Doe "failed to show how the information to be obtained . . . would have defeated the defendants' motion for summary judgment." Alicea, 744 F.3d at 789.

## III.

For the foregoing reasons, we **AFFIRM** the judgment below.

| **T.L.'s answer to Question 4** | **Jane Doe's answer to Question 4** |
|---|---|
| In order to adequately address the issue surrounding sexual education, or lack thereof, there should be mandatory incorporation of safe sex education as part of health class curriculums nationally.  That way, the information being provided to adolescents is consistent, and therefore more comprehensible and accessible.  This can perhaps improve the awareness of the importance of safe sex practices.  In addition to improving awareness, it is important to also consider providing this form of education to younger populations of adolescents.  In order for children to retain and understand the information being provided to them, it must be reinforced through several years of sexual education.  Starting this education as early as sixth grade, or middle school, would be the most proactively effective way to reinforce the information.  By continuing this education up until graduation, or 12th grade, and consistently presenting the same information regarding safe sex practices, this allows adolescents the opportunity to retain and solidify an understanding of the importance of safe sex.<br><br>    It is important to acknowledge adolescent pregnancies as an important way to prevent the | In order to address the issue surrounding safe sex education, schools should incorporate mandatory safe sex education as part of the health class curriculum on a statewide scale.  This way, the information that is provided to adolescents is consistent, and therefore can be more accessible.  This intervention could help improve the awareness surrounding the issue of safe sex practices.  In order for children to retain and understand this information, it should be reinforced through several years of safe sex education.  Therefore, it is important to provide this form of education to younger populations of adolescents.  This form of education should start as early as sixth grade, or middle school.  This would be the best way to proactively reinforce this education.  This educat[ ]ion would continue up until twelfth grade and would be presented with the same information regarding safe sex practices.  By presenting the information consistently, this allows adolescents to be able to retain and comprehend the importance of safe sex.<br><br>    It is important to acknowledge adolescent pregnancies as an important way to prevent the excessive gestational weight gain |

| | |
|---|---|
| proliferation of excessive GWG because this demographic is at greatest risk for high-risk pregnancies, a direct determinant to the health issue at hand.  The education and health departments at each school should be charged with the responsibility to not only education children about sexual education and safe sex practices, but also provide those who are pregnant with resources necessary to educate them further on adolescent pregnancies and the importance of stress management.  Health departments should work in tandem with the sexual education programs to supply students with information and services that are readily accessible to all students of all ages. | because this population is at risk for high-risk pregnancies.  This is a direct determinant to the health issue of excessive maternal GWG.  The education and health departments at each school should be responsible for not only education the children about sexual education and safe sex practices, but should also provide education to those who are pregnant.  These departments at the schools should provide the resources necessary to educate them further on adolescent pregnancies.  By helping these adolescents who are pregnant, this can help reduce high-risk pregnancies.  State health departments should work with their sexual education programs in order to provide students with information and services that are easily accessible to all students of all ages regarding adolescent pregnancies. |